# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| AC MEDIA GROUP and ELIZABETH DUFEK, | |
| Plaintiffs, | Case No. 19-CV-1861-JPS |
| v. | |
| ISABEL MACCHIA, | **ORDER** |
| Defendant. | |

On December 19, 2019, Plaintiffs Elizabeth Dufek ("Dufek") and AC Media Group, LLC (collectively, "Plaintiffs") filed a complaint against Isabel Macchia ("Macchia") alleging violations of Wisconsin state law arising from an online business venture. Plaintiffs alleged that the Court had diversity jurisdiction over the case pursuant to 28 U.S.C. § 1332(a)(1). *See* (Docket #1 ¶ 1). The following day, Plaintiffs filed a motion for a temporary restraining order against Macchia, seeking reinstatement of financial and administrative control over the online company. (Docket #5). On December 23, 2019, the Court requested additional briefing on the issue of its jurisdiction in light of the fact that Dufek is a Wisconsin citizen, Macchia is a citizen of Australia, and AC Media Group appeared to be a citizen of both Wisconsin and Australia, thereby destroying diversity. *See Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007); (Docket #10). Plaintiffs have since filed an amended complaint, which alleges that AC Media now has only one member, that being Dufek, because Macchia recently voluntarily withdrew her membership pursuant to Wis. Stat. § 183.0802(a)(1), (c)(1). (Docket #11 ¶¶ 6, 45–46). Accordingly, both plaintiffs

are citizens of Wisconsin only, and the defendant is a citizen of Australia. The Court is satisfied that it has subject matter jurisdiction under 28 U.S.C. 1332(a)(2). It will now turn to the pending motion for a temporary restraining order which, for the reasons explained below, will be denied.

1. **RELEVANT FACTS**

Instagram is a photo-sharing application that is commonly leveraged by users and companies for advertisements. Instagram users with sizeable followings may be contacted by companies to promote products in exchange for money. Instagram users who receive money to advertise products via posts try to maximize the interactions that their posts receive in order to garner additional paid promotions. It is believed that Instagram's algorithm favors posts with more likes or comments. Accordingly, if a photo has a burst of engagement—i.e. likes or comments—soon after it is posted, the Instagram algorithm will push that post to the top of other users' photo feeds, ostensibly because that post is popular and of interest.

In order to harness the power of the algorithm, some Instagram users have created "engagement groups" in which participants agree to engage with each other's posts by liking, commenting, or sharing, in a timely fashion. Members of engagement groups will make a post appear popular and of interest in order to manipulate the algorithm into promoting the post on other users' feeds. Thus, when a user posts a new photo, they will send their engagement group a link to the post so that other members in the group can click the link and immediately like or comment on the photo. The engagement groups are based on reciprocity—i.e., they work because members agree to engage with each other's content. However, some users will pay to "drop" their content in an engagement group without having to

engage with other users' content. When a paid user drops a link, the non-paying users in the group will have to engage with the content or risk being ejected from the group, and thereby lose the opportunity for their own content to receive a boost in engagement.

These engagement groups are hosted on other online platforms, such as Telegram, because Instagram does not sanction them. Indeed, the groups violate Instagram's Platform Policy and Community Guidelines, which users must abide by under the Terms of Use. *See* Instagram, "Terms of Use," https://help.instagram.com/581066165581870 (requiring users to abide by the Community Guidelines and Platform Policy); Instagram, "Community Guidelines," https://help.instagram.com/477434105621119 (asking users to "foster meaningful and genuine interactions" by "not artificially collecting likes, followers, or shares."); Instagram, "Platform Policy," https://www.instagram.com/about/legal/terms/api/ (prohibiting participation "in any 'like,' 'share,' 'comment' or 'follower' exchange programs.").

The effect of these groups is to push less meritorious content to the tops of users' feeds, contributing to a sort of content pollution akin to that perpetuated by "bots," or automated computer programs designed to act like humans. Moreover, advertisers working with influencers who use engagement groups may not be reaping the full benefit of their bargains, as the first wave of engagement that a post receives is artificial, and the subsequent users that a post reaches due to the artificially inflated engagement statistics may not be interested in the product or the influencer—in other words, they may not be the targets for the advertisements. Finally, there is some risk associated with using engagement groups, as Instagram may ban accounts suspected of violating

its terms and conditions. *See* Instagram, Terms of Use, https://help.instagram.com/581066165581870 ("We can refuse to provide all or part of the Service to you (including terminating or disabling your account) immediately. . .if you. . .violate these Terms of Use or our policies (including our Instagram Community Guidelines)); *see also* Alex Kantrowitz, *Facebook Removes 10 Instagram Algorithm-Gaming Groups with Hundreds of Thousands of Members*, BuzzFeed News (May 11, 2018), https://www.buzzfeednews.com/article/alexkantrowitz/facebook-removes-ten-instagram-algorithm-gaming-groups-with.

In late 2018, Dufek and Macchia founded "AC Media," which operates several Instagram engagement groups via Telegram. The AC Media engagement groups—of which there are many—also feature a mechanism by which users can pay a fee in order to drop their posts in the groups without having to reciprocally like and engage with other posts. These paid memberships are called "premium memberships." Dufek and Macchia each ran AC Media, administered and used its engagement groups, and benefited from its premium membership profits throughout 2019. Then, in December 2019, Macchia suddenly and unilaterally appropriated control of the AC Media links and the bank account through which AC Media directed its profits. Dufek lost administrative controls to AC Media's engagement groups, and could no longer post in them herself. Moreover, she lost access to the AC Media bank account. Macchia informed their clients that Dufek was no longer affiliated with the company, and made changes to the logos of some of the engagement groups. Several days later, Macchia withdrew as a member of the AC Media.

2.  **LEGAL STANDARD**

"[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (quotation omitted). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). In the "threshold phase," the Court must determine if the movant has met its burden to establish that: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.* (internal citations omitted). If the party seeking a preliminary injunction fails to satisfy its obligation to demonstrate any of these elements, the Court should not grant the injunction. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). And, only in the event that "the [C]ourt finds that the moving party has passed this initial threshold, [will] it then proceed[] to the balancing phase of the analysis." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.

"In this second phase, the court, in an attempt to minimize the cost of potential error, 'must somehow balance the nature and degree of the [movant]'s injury, the likelihood of prevailing at trial, the possible injury to the [non-movant] if the injunction is granted, and the wild card that is the 'public interest.'" *Id.* (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)). "Specifically, the [C]ourt weighs the irreparable harm that the moving party would endure without the protection of the

preliminary injunction against any irreparable harm the nonmoving party would suffer if the [C]ourt were to grant the requested relief." *Id.* (citing *Abbott Labs.*, 971 F.2d at 11–12). This process involves engaging in what the Court of Appeals terms "the sliding scale approach; the more likely the [movant] will succeed on the merits, the less the balance of irreparable harms need favor the [movant's] position." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). "[T]his balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. "Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Id.* (quoting *Lawson Prods.*, 782 F.2d at 1436).

2.  ANALYSIS

    2.1  Irreparable Harm and Inadequate Remedies at Law

The Seventh Circuit teaches that "[o]nly if [the movant] will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction. . .The question is [] whether the [movant] will be made whole if he prevails on the merits and is awarded damages." *Roland Mach. Co.*, 749 F.2d at 386. This is an exceedingly high burden. The movant must show not simply that obtaining money damages at judgment will be "inadequate"— he must show that they will be "seriously deficient as a remedy for the harm suffered." *Id.* Further, the Supreme Court has emphasized that a movant must do more than show a possibility that irreparable harm may occur; it must "demonstrate that irreparable injury is likely in the absence of an

injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

The movant may meet this burden by demonstrating that, absent an injunction, (1) it will become insolvent or lose its business; (2) it will be unable to finance its lawsuit; (3) it will incur damages that are very difficult to calculate; or (4) the non-movant will become insolvent or lose its business (and thus become unable to pay any money damages). *Roland Mach. Co.*, 749 F.2d at 386. If a movant will not incur losses so great as to threaten its solvency, or if a movant's losses will be largely economic, measurable, and compensable, there is no irreparable harm. *Praefke Auto Elec. & Battery Inc. v. Tecumseh Prods. Co. Inc.*, 255 F.3d 460, 463 (7th Cir. 2001). To the extent that a movant claims the loss of something intangible and difficult to quantify, like goodwill or reputation, she must submit some evidence of this loss to vault the claim above "mere speculation." *Am. Guard. Warranty Servs., Inc. v. JCR-Wesley Chapel, LLC*, 16-CV-11407, 2017 WL 2224883, at *10 (N.D. Ill. May 22, 2017) (citing *Gateway E. Ry. Co. v. Term. R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (explaining that a "showing [of] injury to goodwill" could constitute irreparable harm)).

Dufek and AC Media claim that their reputations have taken a nosedive since Macchia took control of the companies, and that their influence online continues to dwindle. (Docket #6 at 17). The question of reputation and influence appear to be one and the same, as the complaint does not indicate that Dufek is known for anything in particular except having a lot of followers. The complaint mentions that micro-influencers such as Dufek and Macchia may exert their influences on various niches, but it does not say what those niches are. Nor does Dufek allege that Macchia has been speaking negatively about her, thereby besmirching her

good name in the online advertising community. The engagement groups are not trademarked, and there are no allegations that consumers or members will be confused by the changes in icons and logos, which will, in turn, result in damage to the groups' reputations. To the contrary, it is not uncommon for online profiles and personalities to change their icons or logos, and it seems that the groups in question successfully underwent a rebranding campaign in 2018. *See* (Docket #6 at 8).

In any case, Dufek alleges that her sphere of influence has diminished since Macchia took over the engagement groups. For example, when Dufek was allowed access to AC Media's engagement groups, her posts reached between 7,000 and 12,500 users. *Id.* at 12. Since Macchia has blocked Dufek from accessing the engagement groups, Dufek's reach has fallen to 1,800 users.[1] However, she does not allege that she has lost followers—only that her posts are no longer favored by the algorithm. Since Dufek's posts no longer reach as many people on Instagram because they are not artificially pushed to the top of users' feeds, she believes that she has lost advertisement revenue. She claims that it is "impossible to tell exactly how many advertising opportunities" she missed out on as a result of Macchia's actions. (Docket #6 at 17).

While the exact number of lost advertising opportunities may be elusive, Dufek's losses are calculable. *See Am. Guard. Warranty*, 2017 WL 2224883, at *10 (finding that damages are not incalculable simply because

---

[1]The Court initially questioned whether equitable relief should be available to Dufek based on her artificially inflated engagement statistics. *See Kenosha Cty. v. Town of Paris*, 434 N.W.2d 801, 807 (Wis. Ct. App. 1988) ("one who seeks equity must have clean hands"). However, the Seventh Circuit has stated that wrongdoing unrelated to the action at hand is not a basis to deny equitable relief. *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 601 (7th Cir. 1986).

"some uncertainty may inhere in determining Plaintiffs' lost profits."). For example, Dufek could calculate the average of the last eleven months of advertising revenue to arrive at December 2019's figure. Or, she could compare what her advertisement revenue was in Decembers of 2017 and 2018 and increase the revenue for December 2019 by an appropriate factor. Dufek also claims that it is "likely and foreseeable" that companies will no longer contract with her for advertising on Instagram due to the drop in her reach, but she has not established that this has happened yet. (Docket #6 at 17). To be sure, Dufek's posts reach fewer people because their engagement is not artificially inflated, but there is no indication that this has resulted in lost advertisement and revenue for her. And, even if it did, there is no reason why the lost revenue could not be calculated and compensated, as discussed above. Similarly, AC Media's losses are not unknowable—during discovery, Plaintiffs will be able to subpoena information from Macchia to reveal the diverted profits, which can be used to calculate damages.

Dufek also alleges that since Macchia has taken control of the company, at least ten premium members have cancelled their memberships to the engagement groups. Dufek believes that Macchia's actions will render the company insolvent, which will prevent Macchia from paying damages. A claim that the non-movant will commit actions that will render her insolvent and unable to pay damages is sufficient to establish irreparable harm under *Roland Mach. Co.*, 749 F.2d at 386. However, there must be some showing that the business's solvency is threatened. *See Praefke*, 255 F.3d at 463 (finding no irreparable harm to plaintiff when only a small part of the business was affected and "profits have not fallen to a point that threatens its solvency").

Here, Dufek demonstrates that the engagement groups have suffered a decline of ten premium memberships, but offers no information regarding the cost of these memberships, the percentage of the overall business these memberships constituted, or the average monthly turnover rate for comparison. If the loss of ten premium memberships is sufficient to threaten the solvency of the business, and if each membership were only a few hundred dollars, then the Court questions whether the $75,000.00 amount in controversy has been met. Additionally, the Court is left to wonder whether the ten lost memberships represents a significant number in the overall count of memberships, or whether it is an incidental loss that could be equally attributed to another force such as personal end-of-year budgetary concerns, fear of having an account banned for violating Instagram's terms and conditions, or a general skepticism about the efficacy and benefit of such groups. In short, there is no showing that the ten lost premium memberships threaten the solvency of the engagement groups.

Additionally, the facts do not give rise to the inference that Macchia will become insolvent if injunctive relief is denied. Macchia herself is a micro-influencer and apparently uses the engagement groups for her own personal profit. Moreover, Dufek alleges that, on information and belief, Macchia's sole revenue source is the engagement groups, and she has no other financial means of paying any calculable damages. If this is true, then Macchia will have every incentive to ensure that the engagement groups remain a profitable, going concern. *C.f. Ferguson v. City of Kenosha*, 93 N.W.2d 460, 463 (Wis. 1958) (holding that "[a]cts which destroy, or result in a serious. . .change in[] property constitute irreparable injury."). Aside from the ten lost premium memberships, there is no sign that Macchia is not competent to run the companies, or that her business tactics are likely to

result in the fold of the company. If the assets—i.e., the groups—remain viable, then there is every reason to believe that Macchia will be able to compensate Dufek for any harm, should it occur.

3. **CONCLUSION**

For the reasons explained above, the Court determines that this case does not clearly demand the *ex parte* injunctive relief that Plaintiffs request. The harms to AC Media and to Dufek's advertisement efforts could be compensated, and there is no indication that Macchia is conducting herself in a way that would result in an inability to pay any damages, if indeed any are warranted.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for a temporary restraining order (Docket #5) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 9th day of January, 2020.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge